haKENNETH S. HIXON, Judge, dissenting. I am mindful of our standard of review in workers’ compensation cases. However, I am equally mindful that our standard of review does not insulate the Commission from judicial review nor renders our function in these cases meaningless, and that we will reverse the award of benefits when we are convinced that fair-minded persons could not have reached the same conclusion arrived at by the Commission. In my view, this is one of those cases. Introduction The claimant is 5'2" and weighs 255 pounds. She has pre-existing medical conditions including, but not limited to, bilateral carpel tunnel syndrome, morbid obesity, depressive disorder, pain in multiple joints, and osteoarthritis. Over the past three years, her work history revealed a pattern of working two or three weeks at a time and then taking several months off for various medical issues or disability. Then, the claimant returns to work and repeats the pattern. That pattern is the source of this claim. The testimony revealed that the claimant worked for the employer for two weeks and then took off for a surgery. After several months off work, she returned for two weeks and then took off as a result of bilateral carpel tunnel syndrome. The claimant filed for social security disability benefits and was denied. After several months and after her social security disability benefits were denied, the claimant returned to work for two more weeks and allegedly sustained an unwitnessed fall at work so severe that it ruptured tendons in each of her knees. The unwitnessed fall was followed up later by two additional “falls” witnessed by other employees as described below. Shortly after the falls, the claimant’s husband took her to see her personal physician and 1ushe gave her physician a history and description of the falls. Her personal physician’s report states: “She was sitting on a ramp and stood up. She took two steps and said her knee twisted and gave way. She said she did not trip on anything.... She says she took some leftover hydrocodone the past two days for hand pain. She has been out of her blood pressure medication.” As a result of the falls and her knee injuries, the claimant filed a claim for non-work-related short-term disability benefits. To apply for the non-work-related benefits, the claimant had to prepare and sign an Accident/Sickness Status Report form. The form contained a simple unambiguous question: “IS THIS SICKNESS OR INJURY DUE IN ANY WAY TO YOUR EMPLOYMENT ? IF ‘YES’ GIVE FULL PARTICULARS ON REVERSE SIDE.” The claimant answered “NO,” and therefore the claimant did not “give full particulars” on the reverse side of the form. The claimant began receiving the non-work-related benefits. To continue to receive these non-work-related disability benefits, the claimant filled out this same report form monthly. The claimant filled out this form seven times between October 2010 through May 2011. On each monthly form, the claimant answered “NO,” declaring that the injury was not due in any way to her employment. Finally, on July 21, 2011, ten months after the alleged falls occurred and when the non-work-related short-term disability benefits ran out, the claimant changed her mind and changed her answer on the report form and declared “YES,” that this injury was due to her employment. The claimant filed a workers’ compensation claim, the ALJ awarded benefits, and the Commission affirmed the award. I am convinced that fair-minded persons could not reach that conclusion. |1B Discussion After returning to work after her unsuccessful claim for social security disability benefits for each of her hands, the claimant was employed by Firestone as a “folder” in the production department. After only two weeks of returning to work, the claimant testified that she suffered three falls at work on September 22, 2010. Generally (she gave at least five different versions of the mechanics of the falls discussed below), she alleged that around 6:00 a.m. she fell and injured her right knee. There was another employee in the area but that employee did not witness the fall. According to the claimant, she could not get back up and was helped by other employees into a wheelchair and taken to the first-aid room. She said that later she tried to get up from the wheelchair to go to the bathroom and when she put her weight on her non-injured left leg, she fell a second time. Dwight Dixon, a supervisor at Firestone, witnessed the second fall and described it as a slow-motion fall in which the claimant landed on her backside, and that her knees did not impact anything. The claimant testified that her left leg remained uninjured after the second fall. After that, the claimant’s husband came to pick her up, and while the claimant was walking to the parking lot with the help of Bruce Yelverton, her legs gave out and she fell a third time. According to Dixon, who also witnessed this fall, the claimant went down again in slow motion and slid down the wall on her left side, and again landed on her backside. The claimant alleged that this third fall caused the injury to her left knee. Within hours of the alleged accident, the claimant was seen by her personal family physician, Dr. Thomas Fox. One would presume that a patient would be objective and |1fihonest in reporting conditions, symptoms, and causation to her treating family physician only hours after the occurrence. She told Dr. Fox that she had taken some leftover hydrocodone (from her previous bilateral carpel tunnel condition), that she was out of her blood-pressure medication, and that she was sitting on a ramp and stood up. She took two steps and said her knee twisted and gave way. She said she did not trip on anything. Dr. Fox ordered x-rays of both knees, which revealed no fractures but identified a small calcification in the region of the right quadriceps tendon. MRIs of both knees were performed on October 18, 2010. The MRIs detected tears in the quadriceps tendon of each knee. The quadriceps tendon attaches the quadriceps muscles in the thigh to the patella or knee-cap. The radiology report noted that bilateral tears are often associated with systemic disease including hyperparathy-roidism, chronic renal failure, diabetes, rheumatoid arthritis, gout, or with a history of steroid injections. Dr. Mitchell opined that he could not understand why a fall on the right knee would cause the same ruptured tendon on the left knee and he concluded, “At this point, I think she probably has a systemic disease.” Dr. Gruenwald, the orthopedic surgeon, stated that in his practice that he sees quadriceps tendon tears at least once a month. However, he further stated that he has seen only three or four cases of bilateral quadriceps tendon tears in his twenty years of practice. Dr. Gruenwald also recommended an endocrinology consult to make sure there was no underlying illness predisposing the claimant to these types of injuries. The claimant refused additional testing to determine the nature of the systemic disease on at least three occasions. Dr. Gruenwald performed the surgery to repair the quadriceps tendons on January 7, 2011. The operative report states that |17the “pre-operative diagnosis ” and the “post-operative diagnosis ” were “bilateral quadriceps tendon ruptures, chronic.” The operative report also indicates that during the surgery Dr. Gru-enwald debrided scar tissue from the tendon. All of these notations support a finding of an old chronic injury caused by underlying systemic disease instead of a new acute fresh injury caused by an alleged fall at work. In addition to the account of the fall she gave to her treating physician, Dr. Fox, within hours of the alleged falls, the claimant gave several other versions of how the falls occurred. First, “teammate stated.... [wjhen she finished, she then proceeded to come out and just as she got to the end of the ramp, she tripped and fell on her right knee.” A second version was given by the claimant to the workers’ compensation carrier’s representative a day later on September 28, 2010. The claimant stated that she stepped off the ramp, intentionally stepped on a metal bar, and then she “twisted off balance and down I went.” A third version was given to UAMS and her surgeon two months later on November 24, 2010, and the claimant stated she fell forward “and hit both of her kneecaps.” Finally, a fourth version was given at the hearing. The claimant testified “her right foot hit that piece of metal bar” when she stepped off a ramp and then she “went off balance and hit the floor landing on her right knee.” The claimant’s self-serving testimony at the hearing was inconsistent with her previous versions of the fall. The claimant had the burden of proving a compensable injury. On review to this court, we will affirm the Commission if there exists substantial evidence to support the Commission’s findings. All of the medical evidence in the record indicates that a bilateral quadriceps tendon rupture is highly unusual and typically caused by an underlying medical 118condition. The claimant repeatedly refused additional testing to determine the underlying medical condition. The first fall was unwit-nessed despite the fact that a co-employee was in the area. The second and third falls were described as slow-motion falls. The claimant told her physician that her knee just gave out and so she applied for, and received, non-work-related short-term disability payments by declaring that her knee injuries were not related to her employment. It was only when the non-work-related short term benefits ran out that the claimant changed her mind and declared the falls were, in fact, work related. Conclusion On this record I cannot find substantial evidence to support the Commission’s award of compensability. Therefore, I would reverse.